UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Ann Klinge, an Individual, | |
| Plaintiff, | Case No. 12-2392 (JNE/SER) |
| v. | |
| Gem Shopping Network, Inc. a Georgia Corporation, and Precision Gem Lab, Inc. a Georgia Corporation. | **AMENDED COMPLAINT**<br>**Jury Trial Demanded** |
| Defendants | |

Ann Klinge, for her complaint against Gem Shopping Network, Inc., and Precision Gem Lab, Inc., states and alleges as follows:

### PARTIES AND JURISDICTION

1. Ann Klinge is a natural person residing in Washington County, Minnesota.

2. Gem Shopping Network, Inc. is a Georgia corporation with its principal place of business at 3259 Duluth Highway 120, Duluth, GA 30096. It has a national business presence, marketing and selling products nationwide on its satellite and cable television show, as well as on its website.

3. Precision Gem Lab, Inc. is a Georgia corporation with its principal place of business at 175 West Wieuca Road, Atlanta, GA 30342. It was administratively dissolved in September 2010. It was owned and operated by George Houghtaling.

4. From 2004 until its dissolution, Precision Gem Lab, had only one customer and one purpose: To provide appraisals to Gem Shopping Network, Inc. to be used in the national marketing and sale of its products.

1

5. This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the Plaintiff Ann Klinge is a resident of Minnesota, all Defendants are residents of Georgia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391(c), § 1391(a)(2), and 1400(a), because a substantial part of the events giving rise to the claims occurred in this judicial district and division, and because Defendants Gem Shopping Network, Inc., and Precision Gem Lab, Inc., and Plaintiff are subject to personal jurisdiction in this judicial district and division.

**FACTS**

7. GSN operates a shopping channel that markets and sells gems and jewelry worldwide. According to its website: "Our vast array of on-air personalities and guests will not only show you these amazing, unique pieces, they also show their senses of humor, share personal stories and provide valuable insight into the jewelry industry. An interesting fact about our programming is that people watch our show for education and entertainment, and while watching, a piece inevitably catches their eye and they have to have it."

8. GSN markets itself as an educational, as well as a sales, show.

9. GSN routinely provides customers with appraisals of its products. Between 2004 and 2010, those appraisals were provided by Precision Gem Lab.

10. The appraisals GSN obtained from Precision Gem Lab state a dollar amount "insurance retail replacement value" for each gem.

11. GSN used the appraisals and written valuations as a marketing tool, offering the products to customers at prices below the values set forth in the appraisal reports to persuade potential customers that the prices GSN was charging were approximately wholesale prices or were less than the usual retail price.

12. Klinge started watching GSN in July 2009, at which time she purchased a few items for personal use.

13. At the time, Klinge was looking for a way to supplement her income and to invest money she had recently received money from an inheritance.

14. In the fall of 2009, GSN customer service manager, Kenny Brown encouraged Klinge to use this money to start a jewelry business. Brown told Klinge she could purchase jewelry from GSN and resell it at a profit.

15. Brown told Klinge that GSN sold its jewelry at prices lower than retail prices, and if Klinge were to do the extra work it takes to sell jewelry at trade shows, she could reasonably expect to sell the jewelry at the prices listed in the appraisals GSN obtained from Precision Gem Lab and discussed on-air.

16. Brown told Klinge that GSN is able to sell its jewelry at wholesale prices because it frequently buys estate jewelry and rough stones, because it designs the jewelry in house, and because its sales strategy is mass marketing instead of retail marketing.

17. Brown told Klinge she would be able to start a profitable jewelry business by purchasing from GSN and selling at trade shows at retail prices.

18.     Brown knew that Klinge had no prior experience or expertise in gemology or as a gemstone dealer. Brown told Klinge that part of GSN's purpose is to educate. This is consistent with GSN's website, which promotes its show as being founded on three principles: "Honesty, Integrity, and Education."

19.     In reliance on Brown's representations and the appraisals, Klinge took steps to start a jewelry business. Klinge formed an LLC in January 2010 and invested nearly $20,000 in equipment for the business.

20.     From October 2009 through the end of 2010, Klinge paid GSN more than $620,000 for jewelry in pursuit of her business. Every purchase Klinge made was in reliance on representations made by Brown and other GSN employees that she was purchasing at lower than retail prices, and that she would be able to resell all the jewelry for the retail prices.

21.     During one telephone conversation, Brown told Klinge he went to the mall and priced colored changed garnets to prove to himself and to be able to tell Klinge that he was not just taking the GSN Hosts' word about the value and rarity of the gems.

22.     In February 2010, Brown called Klinge at home to solicit her purchase of a red Tanzanian Spinel that he said Precision Gem Labs valued at $185,000. Brown represented to Klinge that the Tanzanian Spinel was of high quality. Klinge had never heard of this gemstone prior to Brown's call.

23.     During the February 2010 call, Brown stated that a private dealer would be coming in to look at the Tanzanian Spinel. He explained that GSN had an obligation to

offer the stone to the public and the network would show the stone at 1:00 p.m. that day. He said that it would be a major upset if Klinge purchased the gemstone, because no one would expect a member of the buying public to outbid a private dealer. To Klinge's knowledge she was the only one bidding on this item when it was offered to the public on air.

24. Klinge watched the GEM Shopping Network episode advertising the 7.56 carat Super Neon Tanzanian Spinel. The GEM Shopping Network host stated the retail value of the Neon Tanzanian Spinel was $185,000.

25. Klinge called in and purchased the Tanzanian Spinel for $70,000. She made the purchase in reliance on Brown's representation that the stone was of a high quality and an item she needed for her business inventory, on the representation that it had a retail value of $185,000, and on the representation that $70,000 was the gem's wholesale value. The defendants knew or should have known that the gem's actual wholesale value was only $37,800, and its actual retail value was $64,260.

26. In an October 2009 broadcast, a GSN host misrepresented the value of Tsavorite Garnet as $74,800 by providing an appraisal from Precision Gem Lab. GSN also categorized the gem as "Top Gem World Class Ultra Rare." In reliance on the representation of the gem's retail value and on GSN's classification of the gem as "Top Gem World Class Ultra Rare," Klinge purchased a 6.12ct Tsavorite Garnet for $38,250, a price GSN represented as wholesale. The defendants knew or should have known that the gem's actual wholesale value was only $21,420, and its actual retail value was $33,660.

27. In October 2009, a GSN host misrepresented the value of a Chrysoberyl Alexandrite by providing an appraisal from Precision Gem Lab, stating the gem had a retail value of $40,100. It also described the gem as "2.08ct Brazilian Alexandrite Cushion Top Gem World Class 99% Color Change." Klinge relied on the representations made by the GSN host regarding the retail value of the gem and its classification as "Top Gem World Class," and purchased a 2.08ct Chrysoberyl Alexandrite for $18,000, a price GSN represented reflected the gem's wholesale value. The defendants knew or should have known that the gem's actual wholesale value was $8,320, and its actual retail value was $15,600.

28. In December 2009, a GSN host misrepresented the value of a Tanzanite by providing an appraisal from Precision Gem Lab, stating the gem had a retail value of $20,450. GSN described the 8.19ct Tanzanite as "8.19ct Dark Super Neon Tanzanite Cushion Top Gem World Class." Klinge relied on the representations made by the GSN host regarding the gem's retail value and its classification as "Top Gem World Class," and purchased an 8.19ct Tanzanite for $5,500 in December 2009, a price GSN represented reflected the gem's wholesale value. The defendants knew or should have known that the gem's actual wholesale value was $2,866, and its actual retail value was $5,324.

29. On another occasion, GSN host misrepresented the value of a Spinel by providing an appraisal from Precision Gem Lab, stating the gem had a retail value of $14,050. GSN described the 4.58ct Pink Spinel as "4.586ct Hot Pink Natural Spinel Roval Top Gem

World Class." Klinge relied on the representations made by the GEM Shopping Network host regarding the gem's retail value and its classification as "Top Gem World Class," and purchased the Hot Natural Spinel for $5,500, a price GSN represented reflected the gem's wholesale value. The defendants knew or should have known that the gem's actual wholesale value was $2,290, and its actual retail value was $4,580.

30. In January 2010, a GSN host misrepresented the value of a Nigerian Paraiba Tourmaline by providing an appraisal from Precision Gem Lab, stating the gem had a retail value of $24,550. GSN described the 3.89ct Nigerian Paraiba Tourmaline as "3.89ct Nigerian Paraiba Tourmaline Oval Top Gem World Class." Klinge relied on the representations made by the GSN host regarding the gem's retail value and its classification as "Top Gem World Class," and purchased the Nigerian Paraiba Tourmaline for $7,500, a price GSN represented reflected the gem's wholesale value. The defendants knew or should have known that the gem's actual wholesale value was $6,224.

31. In another GSN broadcast, Hosts Wes and Allen stated Paraiba had a wholesale value of $5,000 per carat and a retail value of $10,000 to $12,000 per carat. They said that Paraibas had been mined out with no new finds and therefore prices would go "hog wild." They also stated that Mandarin Garnets were becoming extinct because mining of the gems had ceased when the material became inferior. GSN knew or should have known that the statement that Paraibas had been mined out and that Mandarin Garnets were becoming extinct were false.

32. Klinge purchased Paraibas and Mandarin Garnets in reliance on GSN's representations about the gems' scarcity.

33. GSN Host Steve represented in a television broadcast that, "there is not a lot of green Tourmaline for sale in the world because there is no rough out there. China had gotten ahold of everything. They bought up all the rough in Brazil. It's crazy. They want all our Tourmaline." He made this statement as part of his effort to sell a 25 ct. green tourmaline "prettier than any museum piece" that GSN stated had a retail list price of $22,505. GSN was asking $12,900 for the piece. On air, Steve asked Rafi "what is your absolute bottom price" and Rafi said $11,900. Rafi told the audience that this "stone could not be replaced because there was no more of it. It came from an estate sale in Boca Raton, FL. This stone is trying to be a Paraiba… You will never see anything like it again in our lifetime." GSN's host stated that no rough Tourmaline is coming out of Brazil. He stated "What is coming out of Africa is mediocre. The only people who can afford to work with tourmalines are successful designers with deep pockets. Elsewhere this ring would be $35,000, not $11,900."

34. In another GSN broadcast hosts Hunter and Earl were selling a 1.5 ct. Tanzanian Spinel from the Mahangay deposit. GSN stated that the appraised retail value was $10,050, and the asking price was $6,895. The host explained that there was a limited supply of production in sizes over 1 carat, faceted, and so the gems were difficult to come by.

35. In another broadcast, the GSN host stated color changing garnets were mined out, so the prices would increase substantially. The GSN host stated the price had already tripled and would continue to rise to rival the price of Alexandrites. GSN knew or should have known that the statement that color changing garnets had been mined out was false.

36. Klinge purchased color changing garnets from GSN in reliance on the representation that the gems had been mined out.

37. Klinge made all of her gem purchases believing that she was paying wholesale prices and with the intent that she would be able to resell the gems at or near the retail prices advertised by Gem Shopping Network and Precision Gem Labs.

38. As part of its attempts to sell its products, GSN frequently showed appraisals from Precision Gem Lab on-air to establish the retail value of the product. These appraisals were marketed as independent and neutral appraisals.

39. Precision Gem Lab was not an independent or neutral appraiser, however. It operated as an extension of Gem Shopping Network, which was its sole client. George Houghtaling, its owner, described himself as a subcontractor to Gem Shopping Network. Prior to opening Precision Gem Lab, George Houghtaling was a former manager at GSN.

40. Klinge traveled to multiple trade shows with the inventory she purchased from GSN in an effort to resell the gems at a profit. She was unable to sell a single piece, even for the prices she paid.

41. Eventually, Klinge became suspicious of the appraisals GSN, Precision Gem Lab, and American Jewelry Institute provided and had many of the gems independently appraised. She learned that GSN and Precision Gem Lab had made a number of misleading statements and misrepresentations in promoting the gems she purchased:

- She learned that the appraised retail values presented by Precision Gem Lab and Gem Shopping Network were consistently overstated by about 100 percent.

- She learned that the prices she paid for the gems were not wholesale – or even below retail – prices. Rather, the prices she paid were roughly 10 percent above retail prices, and were nearly double that of wholesale prices for the pieces.

- She learned that the classification "Top Gem World Class" that Gem Shopping Network used to market its gems had no meaning within the gem industry. It does not, as Gem Shopping Network led its viewers to believe, connote a designation of any particular value to a gem. It is merely a term penned by Gem Shopping Network to mislead consumers into believing gems meet a high-quality classification.

42. These independent appraisals also uncovered many false statements and irregularities in the Precision Gem Lab appraisals themselves, including complete mischaracterizations of the quality and number of inclusions in many of the gems.

43. Klinge has had independent appraisals of 20 of the gems, representing approximately half her investment. The appraisals revealed that the purchase prices she paid – which GSN represented as wholesale or below retail prices – exceeded the actual wholesale value of the gems, in many cases by more than 100 percent:

| Gem | Purchase Price | Wholesale value |
| --- | --- | --- |

| | | |
|---|---|---|
| Color Change Garnet 4.28 ct. | $10,700 | $5,350 |
| Color Change Garnet 4.02 ct. | $9,500 | $5,025 |
| Color Change Garnet 3.25 ct. | $9,700 | $2,437 |
| Color Change Garnet 1.36 | $4,100 | $272 |
| Garnet 11.32 ct. | $11,000 | $5,660 |
| Ruby 3.06 ct. | $7,900 | $4,590 |
| Fancy Yellow Diamond 1.19 ct. | $7,500* | $3,808 |
| Pink Diamond 1.00 ct. | $7,500* | $6,500 |
| Tourmaline & Diamond ring | $7,900 | $4,500 |
| Sapphire & Diamond ring | $4,300 | $2,200 |
| Spinel & Diamond Ring | $4,000 | $2,000 |
| Emerald & Diamond Ring | $11,000 | $5,000 |
| Diamond Bracelet | $39,000 | $22,000 |
| Diamond Necklace | $39,000 | $25,000 |
| Tanzanite 8.19 ct. | $5,500 | $2,866 |
| Pink Spinel 7.56 ct. | $70,000 | $37,800 |
| Tsavorite 6.12 ct. | $38,250 | $21,420 |
| Tourmaline 3.89 ct. | $7,500 | $6,224 |
| Alexandrite 2.08 ct. | $18,000 | $8,320 |
| Spinel 4.58 ct. | $5,500 | $2,290 |
| Total | $317,850 | $173,262 |

* The Yellow Diamond and Pink Diamond were purchased together for $15,000.

44. Klinge purchased the gems for the purpose of reselling them. Had she known the prices she was paying were not wholesale prices, she would not have purchased the gems.

11

## COUNT I

### Minnesota Unfair Trade Practices (Minn. Stat. § 325D.09 et seq.)

45. In violation of Minnesota Statutes section 325D.12, GSN directly and indirectly misrepresented to Klinge that the price at which it sold its merchandise to Klinge was an approximately wholesale price, or was less than the usual retail price.

46. GSN, in connection with the sale of its merchandise, displayed price quotations for the merchandise which were fictitiously in excess of the actual prices at which such merchandise is regularly and customarily sold at retail.

47. Klinge relied on the representations of GSN that the prices it sold its merchandise were less than retail and were approximately wholesale by purchasing merchandise from GSN. Had she known the prices she was paying were not wholesale prices, Klinge would not have purchased the gems.

48. Klinge paid GSN approximately $620,000 for merchandise, believing she was paying wholesale prices for products she could resell at the retail prices GSN and Precision Gem Lab represented. The actual wholesale value of the merchandise Klinge purchased from GSN approximately half of what she paid.

49. As a direct and proximate result, Klinge has been damaged in excess of $75,000, in an amount to be proven at trial based upon the difference between the wholesale value the defendants represented and the actual wholesale value of the gems, costs Klinge incurred in her jewelry business and consequential damages.

## COUNT II

**Minnesota Deceptive Trade Practices (Minn. Stat. § 325D.43 et seq.)**

50. In violation of Minnesota Statutes section 325D.44 subd. 1(7), GSN engaged in deceptive trade practices by representing its merchandise was of a particular standard, quality, or grade, when in fact it was not, including representing gems as "Top Gem World Class," a term that has no meaning or use in the gem industry, but misleads consumers into believing a gem is of a particular, increased value because it meets an industry standard.

51. In violation of Minnesota Statutes section 325D.44 subd. 1(11), GSN made false and misleading statements of fact concerning the reasons for, existence of, and amounts of price reductions in the goods it marketed to Klinge and other consumers.

52. In violation of Minnesota Statutes section 325D.44 subd. 1(13), GSN and Precision Gem Lab made statements that were likely to create confusion or misunderstanding about the actual value of the gems sold on GSN, including representations that certain classes of gems had been mined out or were becoming extinct, and the creation and use of purported appraisals that overstated the value of the gems. The defendants engaged in this deceptive conduct willfully and knowing it to be deceptive.

53. As a direct and proximate result of the defendants' deceptive trade practices, Klinge has been damaged in excess of $75,000. Pursuant to Minn. Stat. § 325D.45, she is entitled to an order enjoining the defendants from misrepresenting the value of the

gems sold on GSN, from representing the prices charged for those gems as wholesale or below retail value when they are not, or from falsely stating that gems are rare or scarce.

## COUNT III

### Minnesota Consumer Fraud Act (Minn. Stat. § 325F.69)

54. In violation of Minnesota Statutes section 325F.69, GSN and Precision Gem Lab used fraud, false pretense, misrepresentations, misleading statements and deceptive practices to market and sell its merchandise as being of the highest quality and having a retail value well in excess of its true value. The defendants' misrepresentations and misleading statements include:

- The creation and use of appraisals that overstate the actual retail value of the gems sold on GSN by as much as 100 percent.

- Representing that the prices for which GSN sells its gems are wholesale or below retail.

- Describing gems as "Top Gem World Class" without disclosing that no such classification exists in the gem industry.

- Falsely stating that certain gems are mined out or becoming extinct.

55. The defendants used these deceptive practices with the intent that others rely on them in connection with the purchase of merchandise. GSN promotes its merchandise broadly to the public across Minnesota and the country. According to its website, GSN advertises to more than 40 million households all across America. Klinge paid GSN approximately $620,000 for merchandise, believing she was paying wholesale

prices for products she could resell at the retail prices GSN and Precision Gem Lab represented. The actual wholesale value of the merchandise Klinge purchased from GSN approximately half of what she paid.

56.    As a direct and proximate result, Klinge has been damaged in excess of $75,000, in an amount to be proven at trial based upon the difference between the wholesale value the defendants represented and the actual wholesale value of the gems, the costs Klinge incurred in her jewelry business and consequential damages.

57.    Pursuant to Minn. Stat. § 8.31 subd. 3a, Klinge seeks an order enjoining the defendants from misrepresenting the value of the gems sold on GSN, from representing the prices charged for those gems as wholesale or below retail value when they are not, or from falsely stating that gems are rare or scarce.

## COUNT IV

### Minnesota False Statements in Advertising Act (Minn. Stat. § 325F.67)

58.    In advertising its merchandise, GSN published and disseminated Precision Gem Lab appraisals and broadcast material assertions, representations and statements related to the quality, nature, and value of its merchandise which were untrue, deceptive, or misleading, in violation of Minnesota Statutes section 325F.67. The defendants' misrepresentations and misleading statements include:

- The creation and use of appraisals that overstate the actual retail value of the gems sold on GSN by as much as 100 percent.

- Representing that the prices for which GSN sells its gems are wholesale or below retail.

- Describing gems as "Top Gem World Class" without disclosing that no such classification exists in the gem industry.

- Falsely stating that certain gems are mined out or becoming extinct.

59. The untrue, deceptive, and misleading advertisements and material were disseminated broadly in Minnesota and the country, reaching 40 million households in the United States, according to GSN's website. As a direct and proximate result, Klinge has been damaged in excess of $75,000, in an amount to be proven at trial based upon the difference between the wholesale value the defendants represented and the actual wholesale value of the gems, the costs Klinge incurred in her jewelry business and consequential damages.

60. Pursuant to Minn. Stat. § 8.31 subd. 3a, Klinge seeks an order enjoining the defendants from misrepresenting the value of the gems sold on GSN, from representing the prices charged for those gems as wholesale or below retail value when they are not, or from falsely stating that gems are rare or scarce.

## COUNT V

### Intentional Misrepresentation

61. GSN and Precision Gem Lab represented the merchandise it sold on its website and on its television show was significantly more valuable than the price it was asking.

62. The defendants represented the merchandise had a retail value well in excess of its selling price.

63. GSN represented the prices it charged for the gems it sold to Klinge as reflecting the wholesale value of the gems, when it knew those prices were actually in excess of the gems' retail value.

64. The defendants represented to Klinge that she would be able to immediately re-sell the merchandise she purchased from GSN at the prices Precision Gem Lab described as retail value.

65. The defendants made representations as to the quality and scarcity of the merchandise it sold.

66. The representations made by GSN and Precision Gem Lab were false and omitted material information, as more explicitly described above.

67. The defendants knew these representations were false or omitted material information, or made the representations in reckless disregard of their truth or falsity.

68. The defendants made these representations to induce consumers like Klinge to purchase the merchandise from GSN.

69. Klinge reasonably relied on the defendants' representations by paying GSN approximately $620,000 for merchandise, believing she was paying wholesale prices for products she could resell at the retail prices GSN and Precision Gem Lab represented. The actual wholesale value of the merchandise Klinge purchased from GSN approximately half of what she paid.

70. As a direct and proximate result, Klinge has been damaged in excess of $75,000, in an amount to be proven at trial based upon the difference between the wholesale value the defendants represented and the actual wholesale value of the gems, the costs Klinge incurred in her jewelry business and consequential damages.

## COUNT VI

### Negligent Misrepresentation

71. GSN provided information to Klinge for her guidance in the course of transactions in which GSN had a pecuniary interest.

72. With the exercise of reasonable care, GSN should have known the merchandise it sold to Klinge could not be re-sold for more than she paid for it, that the prices it was charging Klinge were not wholesale prices, and that the prices actually exceeded the retail value of the gems Klinge was purchasing

73. GSN knew that Klinge was purchasing the merchandise in the pursuit of starting a jewelry reselling business.

74. In advising Klinge to invest in the particular gems and jewelry it sold her, GSN failed to exercise reasonable care.

75. As a direct and proximate result of GSN's failure to exercise reasonable care in the communication of information concerning the retail and resale value of jewelry and gems, Klinge has been damaged in excess of $75,000, in an amount to be proven at trial.

WHEREFORE, Ann Klinge respectfully requests that the Court enter an Order as follows:

a) Entering judgment in her favor and against GSN and Precision Gem Lab in an amount to be determined at trial;

b) Pursuant to Minn. Stat. §§ 325D.45, 325F.70, and 325D.15, enjoining the defendants from engaging in the deceptive practices set forth herein;

c) Awarding Ann Klinge her costs and disbursements in this matter;

d) Pursuant to Minn. Stat. §§ 325D.45 and 8.31, awarding Ann Klinge her reasonable attorney fees incurred in this matter; and

e) Granting such other and further relief as the Court deems just and equitable.

**Date:** March 6, 2013

**SNYDER GISLASON FRASIER LLC**

__/S _MICHAEL H. FRASIER_____
Michael Frasier, Esq. (#387704)
Chad A. Snyder (#288275)
233 Park Avenue South – Suite 205
Minneapolis, Minnesota 55415
ph. 612.465.0074
fax 612.605.1986

**J. PAYE & ASSOCIATES ATTORNEYS AT LAW**

__/S JOHNETTA G. PAYE_____
Johnetta G. Paye (Illinois Bar # 6297389)
566 West Lake Street – Suite 225
Chicago, Illinois 60661
ph. 312.627.0054
fax 312.284.4558

Attorneys for Plaintiff